UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JESSICA BOURGEOIS                          CIVIL ACTION

VERSUS                                     NO: 12-2268

MATRANA'S PRODUCE, INC.                    UNITED STATES MAGISTRATE
                                           JUDGE KAREN WELLS ROBY

ORDER & REASONS

Before the Court is **Matrana's Produce, Inc.'s Motion for Summary Judgment (R. Doc. 9)**, in which Defendant, Matrana's Produce, Inc., ("Matrana's Produce") seeks dismissal of Plaintiff, Jessica Bourgeois, ("Bourgeois") sexual harassment and retaliation claims.  Bourgeois has opposed the motion, and also filed a Supplemental Affidavit into the record.  (R. Docs. 16, 17).  Matrana's Produce subsequently filed a Reply (R. Doc. 26).   The Motion was heard on the briefs on Wednesday, July 10, 2013.

I.     **Background**

Bourgeois has brought this Title VII employment discrimination suit against Matrana's Produce alleging sexual harassment and retaliation.  (R. Doc. 1).  Her allegations in the Complaint are as follows.  In February 2009, Matrana's Produce, a family-owned agricultural produce distribution company operating in the greater New Orleans area, hired Bourgeois to work as an "marketing/outside sales representative."  (R. Doc. 1, p. 2).  Bourgeois' work was supervised by

Camile Matrana, Jr. ("Camile, Jr.") who runs Matrana's Produce day-to-day activities.  *See id.*

Shortly after Bourgeois was hired, she alleges that Camile, Jr.'s son, Camile Matrana III, ("Camile III") began sexually harassing her, and persisted in doing so even after Bourgeois told him that she was not interested in having a romantic relationship with him.  *Id.*  According to Bourgeois this led to inquiries by Camile III's wife, Sharon Matrana, ("Sharon"), who suspected that Bourgeois and Camile III were romantically involved.  *Id.*

On March 13, 2009 Bourgeois informed Camile, Jr. about the continued harassment.  *Id.* at 2.  However, Camile III continued to send "inappropriate sexual text messages" to Bourgeois.  *Id.* at 3.  Subsequently, on April 24, 2009, Bourgeois informed Anna Matrana ("Anna") and Jill Matrana ("Jill") - two other members of the Matrana family - about Camile III's inappropriate behavior.  *See id.*  Three days later, on April 27, 2009, Camile, Jr. and Anna "informed Bourgeois that she was being terminated because of cutbacks in payroll."  *Id.*

Bourgeois then filed a Charge with the Equal Employment Opportunity Commission, ("EEOC") on July 17, 2009.  *Id.* at 4.[1]  "The charge of discrimination *and the EEOC's investigation* included claims of sexual harassment, hostile work environment, and retaliation."  *Id.* (emphasis added).  At the end of the EEOC's investigation, the agency sent Bourgeois a determination letter, in which the agency found that "evidence shows [Bourgeois] was sexually harassed and subjected to a hostile work environment by [Camile III].  *Like and related to* this investigation, the Commission determined that [Bourgeois]'s discharge was in retaliation for her complaint of discriminatory practices protected by statute."  *Id.* at 3-4 (emphasis added).  The Commission concluded that Bourgeois had in fact been (1) subjected to a hostile work environment, and (2)

---

[1]The EEOC's New Orleans, Louisiana field office was responsible for taking all relevant actions in this case.

discharged in retaliation for complaining about a protected activity. *Id.* at 4.

Bourgeois received her Notice of Right to Sue letter from the EEOC on July 31, 2012. *Id.* at 3-4. Thereafter, on September 13, 2012, Bourgeois brought suit in federal court, alleging that Matrana's Produce violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). As noted above, she alleged sexual harassment based on a hostile work environment (count I), and retaliation (count II). *Id.* at 4. She also appears to have brought state-law charges under the Louisiana Employment Discrimination law for discrimination on the basis of sex, as well as retaliation for reporting sexual harassment. *Id.*[2]

As to the instant motion, Defendants have moved for summary judgment as to Bourgeois' Title VII sexual harassment and retaliation claims. Defendants have not moved for summary judgment on Bourgeois' state law claims, if any.[3] The motion is opposed.

## II.   <u>Standard of Review</u>

Federal Rule of Civil Procedure ("Rule") 56(a) states that a court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A fact is "material" if resolving that fact in favor of one party could affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Poole v. City of Shreveport*, 691 F.3d 624, 626-27 (5th Cir. 2012).

---

[2]Bourgeois' causes of action are not clear. Although the title of Count I states only "Sexual Harassment/Hostile Work Environment," she states therein that "Title VII and the Louisiana Employment Discrimination Law prohibits discrimination in the workplace on the basis of sex." (R. Doc. 1, p. 4). Moreover, Bourgeois states that as to the claims contained in both Count I and Count II, "Defendant acted with malice and reckless disregard of Bourgeois's *federally* protected rights." (R. Doc. 1, pp. 4-5). She does not specifically allege that this "reckless disregard" extends to any of the rights she has asserted under *state* law. There is simply no other basis for assertion of Bourgeois' *state* law claims than the statement that both federal and state law have a "prohibition" on sex-based discrimination in the workplace.

[3]Defendants' intent to limit the scope of its allegations to Title VII is clear from their Motion, which never refers to any particular Louisiana state law discrimination claim, and refers to both Bourgeois' sexual harassment and retaliation claims in the singular. *See* R. Docs. 9, 26). Therefore, to the degree Bourgeois has also sought to bring any claims under Louisiana state law, these claims are not subject to the instant motion.

"After the movant has presented a properly supported motion for summary judgment, the burden shifts to the nonmoving party to show significant probative evidence that there exists a genuine issue of material fact." *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (citation omitted).  Here, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).  Although the Court must resolve factual disputes in favor of the nonmovant, the nonmovant must show more than "some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see Little*, 37 F.3d at 1075 (same).

In considering a summary judgment motion, the Court may consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits."  Rule 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "A court may consider only *admissible evidence* in ruling on a summary judgment motion."  *Mersch v. City of Dallas, Texas*, 207 F.3d 732, 734-35 (5th Cir. 2000) (emphasis added).  Assertions presented in a statement of contested or uncontested facts "are not competent summary judgment evidence." *Metropolitan Wholesale Supply, Inc. v. M/V Royal Rainbow*, 12 F.3d 58, 61 & n.3 (5th Cir. 1994) (quoting *Abbott v. Equity Group, Inc.*, 2 F.3d 613, 619 (5th Cir. 1993).  The Court may consider the admissibility of summary evidence *sua sponte*.  *Bellard v. Goutreaux*, 675 F.3d 454, 460-61 (5th Cir. 2012).

The summary judgment standard in an employment discrimination matter is premised upon a burden-shifting analysis from *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), and its progeny.  Thereunder, the Court must first determine if the plaintiff has established a *prima facie* case of discrimination.  *Id.* at 802; *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002) (finding that in Title VII actions, a *prima facie* standard is used for evidentiary purposes on summary

4

judgment); *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285 (5th Cir. 1986) ("The *McDonnell-Douglas* formula . . . is applicable . . . in a . . . summary judgment situation.").[4]

"Establishment of a *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *see Turner v. Kansas City Southern Railway Co.*, 675 F.3d 887, 893 (5th Cir. 2012) (citing *Burdine*). "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to different factual situations." *McDonnell*, 411 U.S. at 802 n.13. "There is no doubt that vague or conclusory allegations of discrimination or harassment are not enough to survive summary judgment." *Huckabay v. Moore*, 142 F.3d 233, 241 (5th Cir. 1998).

## III.   **Analysis**

### A.   **Sexual Harassment / Hostile Work Environment (Count I)**[5]

#### 1.   ***Prima Facie* Case**

Title VII states that "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment based on a claim of employment discrimination based on circumstantial evidence, the plaintiff first must establish a *prima facie* case. *Hernandez v. Yellow Transportation, Inc.*, 670 F.3d 644, 654 (5th Cir. 2012). To prove her *prima*

---

[4]Admittedly, *Swierkiewicz* has been widely distinguished by other circuits in the wake of *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). However, the Fifth Circuit has not yet joined these other circuits in distinguishing or otherwise limiting the holding of *Swierkiewicz*.

[5]Bourgeois makes no attempt to divide her sexual harassment case from a case of gender-based discrimination, and has not prosecuted her claim other than as a case of sexual harassment. The Court construes her allegations of sexual harassment and discrimination as the same claim.

*facie* claim where the alleged harasser is not her supervisor, Bourgeois must assert that she (1) is a member or a protected group, (2) she was the victim of uninvited sexual harassment, (3) the harassment was based on sex, (4) the harassment affected a term, condition, or privilege of her employment with Matrana's Produce, and (5) Matrana's Produce knew or should have known of the harassment, and failed to take prompt remedial action.[6]  *Harvill v. Westward Communications, L.L.C.*, 433 F.3d 428, 434 (5th Cir. 2005); *Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 298 n.2 (5th Cir. 2001).

Here, neither Bourgeois nor Matrana's Produce contest that Bourgeois was (1) a member of a protected class, of whether the "harassment," to the degree it existed, was (3) based on Bourgeois' sex.  However, the parties sharply dispute whether Bourgeois has satisfied factors (2) and (4).  Each of these factors will be reviewed in turn.

### a.      Victim of Uninvited Sexual Harassment (2)

In support of its Motion, Matrana's Produce argues that Camile III's conduct, while perhaps sophomoric and in bad taste, simply does not rise to a level where it can be construed as "severe or pervasive."  *Id.* at 11-13.  Not only did Bourgeois "engage[] in a litany of consensual conversations with both Camile III and Sharon, her phone records establish that she called and talked to Camile III more often than Camile III called her."  (R. Doc. 9. p. 14).  Specifically, Matrana's Produce argues that Bourgeois' phone records indicate that she called Camile III "at least" 15 times during her employment, and called Sharon 6 times, whereas Camile III called Bourgeois 7 times.  *Id.* Bourgeois also counseled Camile III on issues with his wife and his childhood, told him where she was going for after-work drinks, and invited him to social events with other coworkers - both before

---

[6]For purposes of this Motion, Matrana's Produce has conceded this factor.

*and* after she told Sharon that Camile III's advances had been unwelcome.  *Id.* at 15.

Matrana's Produce argues that this pattern of voluntary conduct does not square with Bourgeois' assertion that Camile III was an aggressor, as "no reasonable person" would have engaged in this level of voluntary conduct.  *Id.*  Matrana's Produce argues that the totality of the circumstances do not indicate that Bourgeois herself found Camile III's behavior to be subjectively hostile.  Instead, Matrana's Produce argues that the relationship between Bourgeois and Camile III is better viewed as, at most, a "flirtatious friendship."  *Id.*

In opposition, Bourgeois admits that she did contact Camile III of her own volition, but did so in order to either "return his voicemails or to end the incessant texting."  (R. Doc. 16, p. 13).

In its Reply, Matrana's Produce argues that at this stage of the proceedings, Bourgeois must provide more than her self-serving allegations to support her claim, but has failed to do so.  *Id.* at 4.  Matrana's Produce also argues that Bourgeois' deposition testimony, attached to her opposition, indicates that she had selectively deleted additional text messages and telephone conversations between herself and Camile III.  (R. Doc. 26, pp. 1-2).  According to Matrana's Produce, Bourgeois testified that these deleted communications were largely about "hanging out."  *Id.* at 2-4.  This, according to Matrana's Produce, is further proof that the contact between Bourgeois and Camile III was voluntary.  *See id.*

Matrana's Produce also reiterates that even if it was true that some of Camile III's behavior might be viewed as harassing, Bourgeois made no meaningful attempt to remove herself from the situation; indeed, Matrana's Produce points out that during the midst of this harassment, Bourgeois elected to have dinner with Joe Baldassarro, Jill Matrana's son.  *See* (R. Docs. 16, p. 5; 26, p. 7).  According to Matrana's Produce, if Bourgeois was indeed afraid, nervous, concerned, or felt harassed by Camile III's conduct in light of the fact that he occupied a position of "relative power"

due to his family relationship with the company's owner, it again defies logic for her to have spent her personal time with a "similarly situated grandson." (R. Doc. 26, p. 7). According to Bourgeois, Camile III also harassed her "via phone calls, voice messages, [and] text messages," as well as "talked to his co-workers about her." *Id.*[7]

The Court notes that shortly after Bourgeois joined Matrana's Produce, she and Camile III became "friendly," and went out for sushi at her recommendation. (R. Doc. 16-2, p. 17). The two then went out for drinks with several co-workers on at least five occasions. *Id.* During this time, Bourgeois counseled Camile III about his unhappy marriage and traumatic childhood. *Id.* at 23. Bourgeois gave Camile III her phone number. *Id.*

On February 28, Bourgeois called in sick after complaining of a headache. *Id.* at 18. Camile III went to Bourgeois' home, taking her a hamburger. *Id.* at 18. Although Camile III's visit was unannounced, Bourgeois accepted the hamburger, and Camile III stayed at Bourgeois' home for approximately twenty minutes. *Id.* Subsequently, Camile III began complimenting Bourgeois at work, stating that "[y]ou're looking really nice today, that looks good, you look good today." (R. Doc. 16-2, p. 24). These comments, as well as several other remarks about Bourgeois' clothes and her general attractiveness, were often made to both her individually, and in front of coworkers. *Id.* at 22. Bourgeois testified that these comments occurred on two or three occasions during March 2009. *Id.*

In early March 2009,[8] Sharon contacted Bourgeois, and told her that Camile III was married

---

[7]Matrana's Produce has contested the admissibility of the content of Camile III's statements to others regarding Bourgeois. The Court finds that the admissibility of the statements has not been adequately established, and therefore declines to consider them.

[8]Bourgeois testified that Camile III came to Bourgeois' house on March 9, 2009 to apologize, and that his apology occurred after Sharon confronted Bourgeois regarding her contact with Camile III. *Id.* at 19-20.

and that Bourgeois should stay away.  (R. Doc. 9-4, p. 72).  It was at this time that Bourgeois expressed her concern to Sharon about Camile III's unannounced visit and gift of the hamburger. (R. Doc. 16-2, pp.18- 19).  Although Bourgeois admitted to Sharon that she had continued to text and call Camile III after he gave her the hamburger, she explained to Sharon that she had done so in the hopes of explaining to Camile III that she was uncomfortable with his actions.  *Id.*

On Monday, March 9, 2009, Camile III showed up at Bourgeois' residence once more, and apologized for previously showing up at her house and offering her the hamburger.  *Id.*  After Bourgeois told Camile III that his presence made her uncomfortable, he got into his car and left.  *Id.* Bourgeois continued to invite Camile III, as well as other Matrana's Produce office workers, out for drinks after work; Camile III continued to show up at these events, and to call and text Bourgeois. *See id.* Bourgeois indicated that the last time she saw Camile III socially was "toward the end" of her employment with Matrana's Produce.  *See id.*

On April 10, 2009, while having after-work drinks with Camile III, Bourgeois and a mutual friend agreed to take Camile III clothes shopping at the mall.  *See id.* at 38-39.  However, the next day Bourgeois later changed her mind and refused to go.  *Id.* at 39.  On April 20, 2009, Camile III again asked Bourgeois to take him to the mall.  Bourgeois reiterated her refusal, texting Camile III that "I told you I'm not going to the mall with you, friend."  *Id.* at 47.  Bourgeois again texted Camile III, stating "The answer is no.  Get your personal shit figured out."  *Id.*

The Court is mindful that it defies common sense for Bourgeois to have continually invited Camile III out for drinks, even after he took actions which made her "uncomfortable."  Although Bourgeois testified that at some undefined point in time she firmly decided that Camile III's overtures were unwanted, she also testified that she continued to invite Camile III and others out for drinks.  Objectively, these are not actions which a reasonable person would take to avoid a

circumstance which they ultimately believed to be hostile, and do not demonstrate that Bourgeois

believed that her workplace was hostile.

However, contravening the heavy weight of this inference is the fact that the text messages

at some point changed, indicating Bourgeois' strong desire that Camile III stop contacting her. This

suggests that Camile III's overtures were later uninvited. The Court notes that the time period at

which Bourgeois unilaterally determined that Camile III would be her "friend" is undefined. Based

on the permissive standard of review employed at the *prima facie* level, the Court finds that this

technical nicety should be construed in Bourgeois' favor. As such, it suffices to show that some part

of Camile III's overtures became "uninvited."

### b.    Harassment Affected a Term, Condition, or Privilege of Employment (4)

In support of their argument, Matrana's Produce argues that on the objective level, Bourgeois

has not alleged that Camile III's actions ever made it difficult for her to perform her job; indeed, she

argues that she "was performing every aspect of her job competently and that her termination is

based on pretext." (R. Doc. 9, pp. 5-6). Based on this inconsistency, Matrana's Produce argues that

Camile III's conduct did not affect a term, condition, or privilege of Bourgeois' employment, and

as such she has failed to make out a *prima facie* claim for sexual harassment. *Id.* at 6.

In opposition, Bourgeois contends, without addressing the admissibility of Camile III's

statements to others, that his statements to coworkers were "humiliating" and that while Camile III

was not a supervisor, "as a member of the Matrana family he occupied a position of relative power"

over her. (R. Doc. 16, p. 15).[9] She argues that a reasonable person would find Camile III's conduct

---

[9]It is clear that Camile III, who had no control over Bourgeois' day-to-day activities, was not her "supervisor" for purposes of Title VII. *See Vance v. Ball State University*, 133 S.Ct. 2434, at 2453-54 (2013).

offensive, especially after she made "repeated attempts to set boundaries in the relationship." *Id.*

"To affect a term, condition, or privilege of employment, the harassment 'must be sufficiently severe or pervasive to alter the conditions of [Matrana's Produce] employment, and create an abusive working environment." *Lauderdale v. Texas Dep't of Criminal Justice*, 512 F.3d 157, 163 (5th Cir. 2007). "The scope of prohibition is not limited to economic or tangible discrimination, and . . . it covers more than terms and conditions in the narrow contractual sense." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations omitted).  Courts look to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

The *Faragher* court cautioned that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788.  "Title VII is not a general civility code for the American workplace." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) (citing *Faragher*, 524 U.S. at 788).  "The test for sexual harassment cannot be met solely by bolstering the employee's subjective perception of otherwise benign speech unaccompanied by any physical action against [the employee]." *Stewart v. Mississippi Transportation Comm'n*, 586 F.3d 321, 331 (5th Cir. 2009).

For this reason, courts have been hesitant to find that the ill-fated pursuit of a "romantic" relationship, without more, creates a hostile work environment. *See Stewart*, 586 F.3d at 330-31 (finding that coworker's statement that he "loved" coworker six times over one-month period did not rise to the level of actionable Title VII sexual harassment).  Additionally, courts have been

strongly influenced by the fact that an employee and the alleged harasser are friends.  *See Shepherd v. Comptrollers of Public Accounts of State of Texas*, 168 F.3d 871, 872-75 (5th Cir. 1999) (finding that in a circumstance where coworkers were friends, unwanted touching of coworker's arm and making offensive remarks were "boorish and offensive," but did not rise to the level of sexual harassment); *Larkins v. Wal-Mart Associates, Inc.*, 2008 WL 3983850 (M.D. La. Aug. 27, 2008) (finding that coworker's continuous touching of aggrieved coworkers backside, interspersed with comments that "it sure would be fun for you to suck my bone," and "it's good when it's hard," were not severe or pervasive where the two employees were friends, and continued to have lunch together after allegedly harassing behavior occurred); *Washington v. Potter*, 2008 WL 5416409, at *6 (W.D. La. Dec. 30, 2008) (finding no hostile work environment where employee maintained friendly relationship with alleged harassers both before and after conduct in question occurred); *Sims v. Equilon Pipeline, Inc.*, 2004 WL 557314, at *11-*15 (W.D. Tex. Feb. 3, 2004) (same).[10]

Here, Bourgeois and Camile III quickly became "friendly."  Bourgeois invited Camile III for lunch, and then for drinks, and then gave Camile III her phone number.  (R. Doc. 16-2, p. 17). Bourgeois counseled Camile III about his personal problems.  Although Camile III showed up at Bourgeois' home unannounced, which apparently made Bourgeois "uncomfortable," this simply fails to explain why she continued to invite him out socially, why she offered to take him shopping, or why, at the very end of her employment, she called Camile III a "friend."  In sum, the Court agrees with Matrana's Produce that the relationship between them is best considered a "flirtatious friendship."  Extending Title VII to these facts, even on the *prima facie* level, would be improvident.

Even setting aside the mitigating element of "friendship" between Bourgeois and Camile III,

---

[10]*Compare Donaldson v. CDB, Inc.*, 335 F. App'x 494, 496-503 (5th Cir. 2009) (citing *Shepherd*, and finding that in circumstance where coworkers had only a working relationship, supervisor who engaged in pervasive harassment who stated he could do anything he pleased, "so long as I don't touch.").

the Court is extremely dubious whether the relationship between Bourgeois and Camile III could be characterized as "severe" or "pervasive."  The Fifth Circuit court has found that decidedly more aggressive and boorish patterns of behavior, denuded from all pretense of "friendship," did not rise to the level of creating a severe or pervasive working environment.  *See, e.g.*, *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (finding no severe or pervasive workplace where coworker, *inter alia*, slapped her on the backside with a newspaper, "grabbed or brushed" against employee's breasts and backside, once held employee's cheeks and tried to kiss her, asked employee to come to the office early so they could be alone, and once stood in the doorway of the bathroom while employee was washing her hands).

Trial courts comparing their conduct to *Hockman* have extended that case to less egregious circumstances.  *See, e.g.*, *Calmes v. JPMorgan Chase Bank*, --- F. Supp. 2d ----, 2013 WL 1856064, at *9-*10 (E.D. La. May 1, 2013) (Barbier, J.) (citing *Hockman*, and finding no *prima facie* hostile work environment in same-sex harassment case where supervisor placed his hands on plaintiff's chest, adjusted plaintiff's tie, and stated "when you're with me, you need to look your best at all times;" invited aggrieved employee to his hotel room; and stated "If I was alone with you, I would give you a big hug and kiss"); *McGehee v. State Farm General Insurance Co.*, No. 08-3851, 2010 WL 1716810, at *5-*7 (E.D. La. Apr. 26, 2010) (Berrigan, J.) (citing *Hockman*, and finding no *prima facie* hostile work environment for pattern of conduct in which supervisor, *inter alia*, gave employee flowers; repeatedly remarked upon his unhappy marriage; stated that the means to keeping a woman happy was "giv[ing] her sex all the time;" and stated he enjoyed working with women "because they smelled so good"); *Thornhill v. Finley, Inc.*, 2008 WL 4344887, at *1-*6 (M.D. La. Sept. 23, 2008) (citing *Hockman*, and finding no *prima facie* hostile work environment where supervisor asked employee whether she was the "fooling around type;" asked her to do sexual favors

in exchange for $300; and upon refusal, asked employee "so you're not going to give me none for my birthday?").[11]

Based on the case law above, the Court is extremely dubious whether Camile III's "phone calls, voice messages, [and] text messages" qualify as "harassment." The at-work comments which Bourgeois specifically referenced took place on only two or three occasions, are also innocuous. According to Bourgeois they consisted of: "[y]ou're looking really nice today, that looks good, you look good today." (R. Doc. 16-2, p. 22-24).[12] Bourgeois also testified that she deleted many text messages, divesting the Court of the full picture of the communications, which can be construed against her such that if the information was available it would be favorable to Matrana's Produce. Even those text messages which Bourgeois chose to preserve do not lead to the conclusion that the conduct in question became intolerable. If Title VII is not designed as a general "civility code," nor does it exist to remedy a soured relationship - a distinction with controlling and persuasive opinions that the Fifth Circuit make abundantly clear.

Even assuming *arguendo* that Bourgeois proffered information showing that the harassment was "severe" or "pervasive," there is a final, more omnipresent problem: Bourgeois has provided no evidence that the "harassment" actually affected her ability to perform her job in any way. *See Royal v. CCC & R Tres Arboles, LLC*, 2012 WL 3867103, at *4 (N.D. Tex. Aug. 9, 2012) (citing *Hockman*, and finding that plaintiff failed to establish *prima facie* case where there was no allegation

---

[11]*Thornhill* characterized these comments as "both unprofessional and a stunning display of bad judgment." *Id.* at *6.

[12]As noted above, Bourgeois also testified that several other remarks about her were made to coworkers outside of her presence; however, she makes no attempt to transform these statements into competent summary judgment evidence, and they can be disregarded.

that she failed to perform her job adequately).[13]

In sum, the Court finds that Bourgeois' contentions fail to satisfy her *prima facie* burden and establish that Camile III's comments affected a "term, condition, or privilege of employment" for purposes of Title VII.  As such, the Court finds that Matrana's Produce Motion for Summary Judgment as to Bourgeois' Title VII "sexual harassment / hostile work environment" claim is granted.

### B.    Retaliation (Count II)[14]

#### 1.    *Prima Facie* Case

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e–3(a).  In order to state a claim for retaliation, a plaintiff must allege (1) she was engaged in protected activity, (2) she was subjected to an adverse employment action, and (3) there was a causal connection between the protected activity and the adverse employment action.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556-57 (5th Cir. 2007).

##### a.    Engaged in a Protected Activity

As to (1), "protected activities" include opposition of any unlawful employment practice, or,

---

[13]An employee has been able to move forward with her hostile work environment claims where the aggrieved coworker worked in close and continuous proximity to her alleged harasser.  *See Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 479-80 (5th Cir. 2008) (finding that employee's rating of coworkers harassing conduct as a "ten" on a scale of "one to ten," that employee did not want to work alone with harassing coworker, and that employee felt "humiliated" every time coworker made a harassing comment, when conjoined with a reduction in her job responsibilities, was sufficient to allow a reasonable jury to conclude that employee subjectively perceived her working environment as hostile or abusive).  In this case, unlike the circumstances in *Aryain*, there is no allegation that Bourgeois and Camile III worked closely together, except for the obligatory three-week period in which Camile III showed Bourgeois how Matrana's produce was packaged.

[14]The parties do not dispute that Bourgeois has properly presented a claim for retaliation.

in connection with a Title VII proceeding, making "a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e–3(a); *Douglas v. DynDermott Petroleum Operations Co.*, 144 F.3d 364, 372 (5th Cir. 1998). The fact that a Title VII complaint is ultimately proven fruitless is not the end of the inquiry; to satisfy the standard, Bourgeois must demonstrate only a "reasonable belief" that Matrana's Produce was engaged in unlawful employment practices. *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 348 (5th Cir. 2007). By the same token, not all "opposition" activity is protected; it must be reasonable under the circumstances, which requires balancing the company's interest against the employee's interests in airing grievances. *Jeffries v. Harris County Community Action Ass'n*, 615 F.2d 1025, 1036 (5th Cir. 1980) (finding that employee failed to properly oppose where he did not comply with stated company policies for airing grievances).

In addition, the employer must have either actual or constructive knowledge of the employee's opposition. *See Watts v. Kroger Co.*, 170 F.3d 505, 511-12 (5th Cir. 1999) (finding that reporting claims of sexual harassment to a supervisor is plainly "opposition" to an "unlawful employment practice" for purposes of Title VII). Such "notice" is typically achieved by submission of a complaint to a company's human resources director. *See Woods v. Delta Beverage Group, Inc.*, 274 F.3d 295, 299-300 & n.3 (5th Cir. 2001).

Here, Matrana's Produce concedes that it did not have a formal policy for submitting harassment complaints, but that employees were "encouraged" to speak to Anna Matrana about any and all difficulties, and that Camile, Jr. would then take care of the problem, which in the past had involved speaking to employees in a group setting. *See* (R. Doc. 16-3). The parties do not contest whether (1) Bourgeois' reporting would have constituted a protected activity, or (2) Bourgeois' reporting of this activity to Anna Matrana, as she alleges, would have been in compliance with

Matrana's Produce's informal custom.  Matrana's Produce also accepts as true Bourgeois' assertion that Bourgeois in fact reported her claims of sexual harassment to Matrana's Produce.  (R. Doc. 9, p. 16).  For purposes of summary judgment, the Court finds that Bourgeois has satisfied the first element of her *prima facie* case of retaliation.

### b.      Suffered an Adverse Employment Action

As to (2), the parties do not contest that Bourgeois' employment was terminated on April 27, 2009, or that termination is an adverse employment action for purposes of Title VII.  *See Harrison v. Corrections Corporation of America*, 476 F. App'x 40, 45 (5th Cir. 2012); *Kent v. Vicksburg Healthcare, LLC*, 2012 WL 1556511, at *12 (S.D. Miss. Apr. 30, 2012) ("[D]ismissal is obviously an adverse employment action.").  Therefore, for purposes of summary judgment, the Court finds that Bourgeois has satisfied the second element of her *prima facie* case of retaliation.

### c.      Causal Connection

The parties sharply disagree as to (3) whether there is a causal connection between Bourgeois' termination and engagement in any "protected activity," namely whether Matrana's Produce ever received notice of the same.  *Compare* (R. Doc. 9-1, p. 4), *with* (R. Doc. 16-20, p. 5) (citing, *e.g.*, Plaintiff's Complaint ¶ 14-15).  The only "concrete" date available is April 24, 2009, as it appears on Bourgeois' calendar, in which she claims she informed Anna and Jill about Camile III.  (R. Doc. 16-5, p. 3).  Matrana's Produce terminated her employment three days later, on April 27, 2009.  (R. Doc. 1, p. 3; *see* 16-1, pp. 31-32).

In order to find a causal connection between a protected activity and an adverse employment action, causation "excludes only those links that are too remote, purely contingent, or indirect." *Staub v. Proctor Hospital*, 131 S.Ct. 1186, 1192 (2011).  "Close timing between an employee's protected activity and an adverse action against him may provide the 'causal connection' required

17

to make out a *prima facie* case of retaliation." *Swanson v. General Services Administration*, 110 F.3d 1180, 1188 (5th Cir. 1997); *Elwakin v. Target Media Partners Operating Group, LLC*, 901 F. Supp. 2d 730, 758 (E.D. La. 2012) (finding that three-day gap between employee's calling the police regarding manager's conduct at staff meeting, and employee's termination, satisfied the causal connection for purposes of *prima facie* case).

Here, the Court notes that around the same time as Bourgeois and Camile III's "friendship" began to sour, on Friday, March 6, 2009, Sharon appeared at Matrana's Produce's office, visibly upset and crying. She walked over to where Bourgeois worked, knelt down on the side of Bourgeois, whispered something, and left. (R. Doc. 16-2, p. 26; 16-3, p. 25).[15] Camile, Jr. saw Sharon enter the building and go to Bourgeois' desk. *Id.* Sharon and Bourgeois continued to talk and text one another after this period.[16] On April 24, 2009, after Bourgeois told Camile III to "get your personal shit figured out," she told Camile, Jr. about Camile III's incessant behavior. On April 27, 2009, Matrana's Produce terminated Bourgeois' employment. The stated grounds for her termination was that the company was eliminating her position because Bourgeois (1) had failed to build the website which Matrana's Produce had hired her to do; and (2) failed to achieve sales goals. The Company also considered the fact that Bourgeois was at the time the company's highest-paid office worker; because it intended to invest in an expensive industrial cooling unit, they were now short of funds. (R. Doc. 16-3, p. 15). Indeed, Matrana's Produce concedes for purposes of this Motion that Bourgeois reported the discrimination, and fails to contest that this occurred on April 24, 2009.

---

[15]Neither Bourgeois nor Camile, Jr.'s deposition testimony mentions the specific date that Sharon visited Bourgeois at work. However, Bourgeois stated in her deposition that Sharon appeared the Friday prior to Camile III's March 9, 2009 "apology" visit. The Friday before March 9, 2009 was March 6, 2009.

[16]Camile III and Sharon are now divorced. (R. Doc. 16-16, pp. 71-72, testimony of Anna Matrana).

The Court has little difficulty concluding that a three-day temporal disparity satisfies Bourgeois' *prima facie* burden for purposes of summary judgment.

### i.      Defendant's Evidence

Because Bourgeois has proven a *prima facie* case of discrimination, she is entitled to a presumption that Matrana's Produce unlawfully discriminated against her.  *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  Matrana's Produce must rebut this presumption by articulating a legitimate, non-discriminatory reason for its conduct.  *McDonnell Douglas*, 411 U.S. at 802.  To do so, Matrana's Produce must produce admissible evidence which would "support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506 (1993).

Here, Matrana's Produce argues that even assuming that it terminated Bourgeois' employment three days after she allegedly reported her harassment, Matrana's Produce had legitimate, non-discriminatory reasons for this action.  Specifically, Matrana's Produce argues that (1) Bourgeois failed to complete the website which the parties discussed in her job interview; and (2) failed to adequately obtain clients in her sales position.  (R. Doc, 16-1, pp. 32-37).  Matrana's Produce also argues that Bourgeois was the highest-paid office worker during her brief tenure, and that it was contemplating upgrading its refrigeration units, at a significant expense.  *Id* at 32.  For all of these reasons, Matrana's Produce determined that Bourgeois, a recently hired, lavishly compensated, and underperforming employee, was expendable.

### ii.      "Spoliation" Argument and Imputed Bad Faith

In her Opposition, Bourgeois first contends that insofar as Matrana's Produce could provide a "legitimate, non-discriminatory reason" for terminating Bourgeois' employment, this is currently an "unopposed articulation" because at no point during the four years since the EEOC first began

investigating Bourgeois' claims has Matrana's Produce produced any documents which reflect Bourgeois' sales performance.  (R. Doc. 16, p. 19).  Moreover, Bourgeois argues that Matrana's Produce refused to produce any company documents undergirding its termination decisions to the EEOC, in particular a "spreadsheet" which documented Bourgeois' work performance and "customer sheets" which documented her contact with Matrana's Produce potential customers.  *Id.* at 19.  Bourgeois also argues that Matrana's Produce "refused to participate in the fact-finding conference, mediation or conciliation."  *Id.* at 18.  Bourgeois characterizes this state of affairs as evincing a lack of "good faith," which she argues should entitle her to an adverse inference as to the contents of both the "spreadsheet" and the "customer sheets."  *Id.* at 19.

Bourgeois argues that because Matrana's Produce has failed to *produce* any such documents to either herself or the EEOC during the four year pendency of the dispute, the documents *must* have been destroyed.  *Id.*  She argues that the Court can impose spoliation sanctions upon Matrana's Produce through an exercise of its inherent powers.  (R. Doc. 16, p. 20 & n.94).

In its Reply, Matrana's Produce argues that its refusal to participate in the administrative process preceding this case cannot be grounds for a spoliation instruction because this decision was by no means arbitrary, but was taken after consulting with a labor expert, Don Strobel, ("Strobel") (R. Doc. 26, p. 9).[17]

---

[17]Strobel was formerly an attorney at the U.S. Department of Labor's Wage and Hour between 1961 and 1993, who had been a "labor consultant" for local New Orleans businesses for the twenty years since his retirement from the Department of Labor.  (R. Docs. 16-14, p. 10-11; 16-16, pp. 31-37; 26, p. 9).

(1)     **EEOC Proceedings**[18]

In support of her Motion, Bourgeois argues that Matrana's Produce failure to produce documents in support of its defense "in part led to the EEOC Determination that the Defendant retaliated against Ms. Bourgeois for reporting sexual harassment."  (R. Doc. 16, p. 19 & n.91). Bourgeois' unstated argument appears to be that the EEOC impliedly adopted spoliation principles to reach its result.

Other courts have found that allegations of spoliation may be addressed through a court's inherent power to regulate the litigation process, if either the conduct in question occurred before the case was filed or no statute or rule adequately addresses the conduct in question. *Yelton v. PHI, Inc.*, 279 F.R.D. 377, 384 (E.D. La. 2011) (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46 (1991)).  "When inherent power does apply, it is interpreted narrowly, and its reach is limited by its ultimate source - the court's need to orderly and expeditiously perform its duties." *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 611 (S.D. Tex. 2010) (quoting *Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir. 2002)).  In order to exercise its inherent power to sanction a party, "The court must make a specific finding of bad faith." *Toon v. Wackenhunt Corrections Corp.*, 250 F.3d 950, 952 (5th Cir. 2001).

Here, Bourgeois' argument is not well founded.  The EEOC's "Determination" does conclude that Matrana's Produce retaliated against her for reporting sexual harassment; however,

---

[18]The Court notes that unpublished cases in the Fifth Circuit have cautioned that for purposes of summary judgment, written statements and documents in an employee's EEOC file are generally not competent summary judgment evidence. *See Cruz v. Aramark Services, Inc.*, 213 F. App'x 329, 333, 2007 WL 98358, at *2-*3 (5th Cir. Jan. 11, 2007). However, the Court's consideration of these portions of the record is solely for purposes of determining whether a spoliation instruction should be given, and not to determine whether a contested issue of material fact exists for purposes of the underlying Motion for Summary Judgment.  The Court does not otherwise rule on the admissibility of these documents, and consideration of the facts here does not constitute admission as competent summary judgment evidence for any other purpose.

it does not state anywhere that this decision was based upon Matrana's Produce failure to produce evidence because they had *destroyed* it.  *See* (R. Doc. 16-11, pp. 1-2).  Indeed, had the *EEOC* believed Matrana's Produce conduct during the administrative phase of this dispute was obfuscatory, it could have issued a subpoena to Matrana's Produce compelling, *inter alia*, "production of evidence including, but not limited to, books, records, correspondence, or documents, in the possession or under the control of the person subpoenaed."  29 C.F.R. § 1601.16(a).  There is no evidence in Bourgeois' voluminous filing that the EEOC exercised this authority, and that it was rebuffed by Matrana's Produce because Matrana's Produce had destroyed the documents.[19]  Therefore, Bourgeois' argument seeking a spoliation instruction based on the EEOC proceedings is not well founded, and to the extent it is a request for relief it is denied.

### (2)   Federal Court Proceedings

Bourgeois' Opposition also asserts that Matrana's Produce has failed to produce the aforementioned "spreadsheet" and "customer sheets" during the course of discovery, even though both Camile, Jr. and Anna have testified that these documents exist.  *See* (R. Doc. 16, p. 19).  Bourgeois contends that she is entitled to a spoliation instruction "since these documents still cannot be produced, and [Matrana's Produce] has not provided an explanation."  *Id.* at 19-20.

Here, Bourgeois has failed to indicate that after filing her Complaint she ever propounded a discovery request under the Federal Rules requesting production of either the "spreadsheet" or the

---

[19]Indeed, the evidence submitted points in the opposite direction.  As to the Fact-Finding Conference, the EEOC told Matrana's Produce that it was "*requested* to appear and participate" in a Fact Finding Conference on February 8, 2012.  (R. Doc. 16-10, p. 1) (emphasis added).  The EEOC did request "all documentary evidence you believe is responsive to the allegations of the charge. . . . *If you submit only an advocacy statement*, unsupported by documentary evidence, the Commission may conclude that Respondent has no evidence of a defense to the allegations of the charge." (R. Doc. 16-10, p. 3) (emphasis added).  As to the EEOC's "mediation," the EEOC told Matrana's Produce in a letter that "Participation in the mediation is *completely voluntary*."  (R. Doc. 16-16, p. 166) (emphasis added).  As to the EEOC's "conciliation process," which took place after its Determination, the EEOC told Matrana's Produce in a letter that it "regret[ted] that Respondent, by not responding to our *invitation* is declining to engage in the conciliation process."  (R. Doc. 16-10, p. 11) (emphasis added).

"customer sheets."  Nor is it clear that Matrana's Produce had an affirmative obligation to produce these documents pursuant to Rule 26(a), as there is no indication that Matrana's Produce intends to introduce these documents to support its claims or defenses in the instant suit; its motion for summary judgment relies entirely on deposition testimony.  Instead, Bourgeois' argument leaps to the conclusion that since Matrana's Produce has failed to produce documents to this point, the documents must have been destroyed.  *See* (R. Doc. 16, p. 18).

In sum, it appears that Matrana's Produce has simply declined to volunteer documents to its adversary during the course of litigation.  Even to the degree Matrana's Produce has failed to comply with a discovery request, this failure does not alone lead to a finding of spoliation.  As Bourgeois correctly points out, to earn a spoliation instruction she "must show that [Matrana's Produce] had a duty to preserve the *destroyed* or *altered* evidence."  (R. Doc. 16, p. 20 n.94) (emphasis added) (citing *Rimkus*).  Bourgeois' opposition includes testimony from Matrana's Produce's employees that the information requested is actually in Matrana's Produce's possession; there is no allegation that this information has been "destroyed" or "altered."

Even if Bourgeois had filed a discovery request for which production was refused, the Court has insufficient evidence necessary to find that Matrana's Produce's "bad faith" warrants the draconian exercise of its inherent powers.  Bourgeois has never moved to compel this information under Rule 37, or otherwise brought Matrana's Produce's discovery failures to the Court's attention.  Bourgeois' failure to utilize the discovery tools at her disposal during the discovery stage of this case weighs strongly against this eleventh hour request that the Court find that Matrana's Produce acted with requisite "bad faith."

### iii.    Legitimate Non-Discriminatory Reason for Termination

In her Opposition, after outlining her spoliation argument, Bourgeois argues that Matrana's

Produce's purportedly legitimate, non-discriminatory reasons for terminating her employment are pretextual.  (R. Doc. 16, p. 20).  In support of her contentions, Bourgeois argues that she was building a website for Matrana's Produce at the time her employment was terminated, and that in fact she built a website for another business, Sal's 90 West a week after joining that company.  (R. Doc. 16-21).

In support of her Opposition, Bourgeois attaches to her Opposition an Affidavit from Todd Vierra, ("Vierra") the owner of Sal's 90 West restaurant, who states that Bourgeois made Sal's 90 West a Matrana's Produce's customer while Bourgeois was a Matrana's Produce's sales representative.  (R. Doc. 16-21).  Vierra's Affidavit also states that Bourgeois built Sal's 90 West a website approximately one week after she arrived.  *Id.*  In its Reply, Matrana's Produce contends that Bourgeois was an "at will" employee who could be terminated at any time.  (R. Doc. 26, p. 8).  Matrana's Produce also contends that Bourgeois' subsequent work for Sal's 90 West has no bearing on the instant case.  *Id.* at 10.

Here, the Court notes that Matrana's Produce does not have formal written procedures in place regarding how sexual harassment claims are to be reported and how they will be handled.  (R. Doc. 16-16, p. 59).  Instead, employees were encouraged to tell Anna Matrana about "anything." *Id.* at 59-60.  Matrana's Produce does not appear to have formal written procedures in place for handling disciplinary matters, and there is no indication that Bourgeois was in fact informed that her work was subpar prior to the termination of her employment.  Indeed, the Vierra's Affidavit indicates that Bourgeois had at least some success in her job as a Matrana's Produce's sales representative, which contradicts Matrana's Produce's contentions in its Motion for Summary Judgment that Bourgeois brought in no business.  The Court finds that there are contested issues of material fact regarding the reason for Bourgeois' termination and its legitimacy.  As such, Matrana's

Produce's Motion for Summary Judgment as to Bourgeois' Title VII retaliation claim is denied.

**IV.**     **Conclusion**

Accordingly,

**IT IS ORDERED** that the Defendant's, **Matrana's Produce, Inc.'s Motion for Summary Judgment (R. Doc. 9)** is **GRANTED** in part and **DENIED** in part.

It is **GRANTED** as to Plaintiff, Jessica Bourgeois' ("Bourgeois") Title VII claim for sexual harassment and creation of a hostile work environment.

It is **DENIED** as to Bourgeois' Title VII claim for retaliation.

**IT IS FURTHER ORDERED** that Bourgeois' request for a spoliation instruction contained in her **Plaintiff's Opposition to Defendant's Motion for Summary Judgment (R. Doc. 16)** is **DENIED**.

New Orleans, Louisiana, this 26th day of August 2013.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**